**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:  LORI BUCCOLO,

                                    Chapter 7
                                    Case No. 05-30789 (RTL)

      Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## OPINION

**APPEARANCES:**

Vincent D. Commisa, Esq.
Attorney for Debtor

Andrea Dobin, Esq.
Sterns & Weinroth, P.C.
Attorneys for trustee, Thomas Orr

Jennifer Novick, Esq.
Phelan Hallinan & Schmieg, PC
Attorneys for Countrywide Home Loans, Inc.

**RAYMOND T. LYONS, U.S.B.J.**

### INTRODUCTION

      The Debtor, Lori Buccolo, moves to reconvert her chapter 7 case to a chapter 13 case. The Chapter 7 Trustee and a creditor, Countrywide Home Loans, both object to the reconversion, questioning the Debtor's good faith and the feasibility of her chapter 13 plan.

      The Debtor wants to save her house from foreclosure by proposing a plan to remain current on her post-conversion monthly mortgage payments, borrow from her retirement account

to pay administrative expenses, make monthly payments to the chapter 13 trustee to be disbursed to her mortgage arrears and unsecured creditors, and pay all her creditors in full by refinancing the mortgage on her home one year after confirmation. Because her plan relies upon substantial monthly contributions from her non-debtor spouse, who has proven unreliable in the past, the plan is not feasible and has not been proposed in good faith.  The motion to reconvert this case from chapter 7 to chapter 13 is denied.

## JURISDICTION

This court has jurisdiction of this contested matter under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a) and the Standing Order of Reference by the United States District Court for the District of New Jersey dated July 23, 1984, referring all proceedings arising under Title 11 of the United States Code to the bankruptcy court.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) concerning the administration of the estate.

## DISCUSSION

The Bankruptcy Code provides for the conversion of a chapter 7 case to chapter 13 under § 706(a): "The debtor may convert a case under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title."  11 U.S.C. § 706(a).  Recently, the Supreme Court has clarified that the debtor does not have an absolute right to convert from chapter 7 to chapter 13. *Marrama v. Citizens Bank of Massachusetts*, 127 S.Ct. 1105, 1112 (2007).  A bankruptcy court may deny a motion to convert on a finding of bad faith or other "cause." *Id.* at 1110-1111.

*Good Faith*

Despite its many references to the concept, the Code is silent on the definition of "good faith." *See e.g.*, *Deans v. O'Donnell*, 692 F.2d 968 (4th Cir. 1982) ("Congress has nowhere in the statute provided a definition of the term 'good faith.' The legislative history is similarly silent on the point . . . ."); *In re Whitlock*, 308 B.R. 917, 921 (Bankr. M.D. Ga. 2004); *In re King*, 131 B.R. 207, 209 (Bankr. N.D. Fla. 1991); *In re Raines*, 33 B.R. 379, 381 (M.D. Tenn. 1983).

The Supreme Court gave some guidance on how to interpret good faith in *Marrama*. It comments, "We have no occasion here to articulate with precision what conduct qualifies as 'bad faith' sufficient to permit a bankruptcy judge to dismiss a Chapter 13 case or to deny conversion from Chapter 7. It suffices to emphasize that the debtor's conduct must, in fact, be atypical. Limiting dismissal or denial of conversion to extraordinary cases is particularly appropriate in light of the fact that lack of good faith in proposing a Chapter 13 plan is an express statutory ground for denying plan confirmation." 127 S.Ct. at 1112 n.11. The Third Circuit wrote in a chapter 7 case, "[A] bankruptcy court's discretion in making a good-faith determination is not without limitations. . . . [A] finding of lack of good faith should not be lightly inferred. [D]ismissal should be confined carefully and utilized only in egregious cases . . . ." *Perlin v. Hitachi Capital America Corp.*, 497 F.3d 364, 373 (3d. Cir. 2007) (internal quotes omitted).

Despite the admonition to limit findings of bad faith to extraordinary or egregious cases, the Third Circuit has placed the burden of proving good faith squarely on the debtor once the objecting party has presented sufficient information to impugn the debtor's good faith. *Perlin*, 497 F.3d at 368-336; *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000) (chapter 7 case), *In re SGL Carbon Corp.*, 200 F.3d 154, 162 n.10 (3d Cir. 1999) (chapter 11 case).

The totality of the circumstances should be considered in assessing good faith in the context of a chapter 13 case. *In re Lilley*, 91 F.3d 491, 496 (3d. Cir. 1996).

> Factors relevant to the totality of the circumstances inquiry may include, among others, the following: the nature of the debt ...; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors.

*Lilley,* 91 F.3d at 496 (internal quotes omitted). Two inquiries are particularly relevant: whether there is a valid bankruptcy purpose such as maximizing value and whether the debtor seeks to obtain a tactical advantage. *In re Integrated Telecom Express, Inc.,* 384 F.3d 108, 119-120 (3d Cir. 2004) (chapter 11 case).

### *Feasibility*

As the parties have also seen fit to address the feasibility of the plan in their arguments, this court will also address feasibility. This approach has been used by other bankruptcy courts in one of two ways. Some bankruptcy courts have analyzed chapter 13 plan feasibility as a part of "good faith." *In re Straugh*, 41 B.R. 757, 758 (Bankr. W.D. Pa. 1984) (denying conversion motion for lack of good faith, because the chapter 13 plan was not feasible). Others have evaluated it as a reason for "cause" separate from the good faith analysis. *In re Sully*, 223 B.R. 582, 586 (Bankr. M.D. Fla. 1998) (denying a motion to convert because the motion was not made in good faith and that a chapter 13 plan was not feasible); *In re Tardiff*, 145 B.R. 357, 360 (Bankr. D. Me. 1992) ("[C]onversion should not be permitted in circumstances where the debtor is demonstrably incapable of proposing a feasible plan."); *In re Lilley*, 29 B.R. 442, 443-444 (B.A.P. 1st Cir. 1983) (affirming lower court's denial of conversion motion because the lack of a

4

"feasible good faith plan"). Whether it is part of the totality of circumstances in a good faith analysis or a separate cause to deny conversion, feasibility may be assessed on a motion to convert.

Chapter 13 in the Bankruptcy Code specifically requires feasibility as a precondition to plan confirmation:

> "[T]he court shall confirm a plan if—. . .
>
> (6) the debtor will be able to make all payments under the plan and to comply with the plan."

11 U.S.C. § 1325(a)(6).

It is the court's role to make a factual determination as to a plan's "reasonable likelihood of success." *First Nat'l Bank of Boston v. Fantasia (In re Fantasia)*, 211 B.R. 420, 423 (B.A.P. 1st Cir. 1997). In other words, "[t]he bankruptcy court should be satisfied that the debtor has the present as well as the future financial capacity to comply with the terms of the plan." *Id.* Thus, a plan is not feasible and is not confirmable if a debtor's income will not support the plan's proposed payments. *E.g.*, *In re Barnes*, 275 B.R. 889, 894 (Bankr. E.D. Cal. 2002) ("[T]he debtors showed no disposable income with which to fund a plan. . . . [T]he debtors have been unable to actually pay the amount projected . . . to the trustee."); *In re Bernardes*, 267 B.R. 690, 695 (Bankr. D.N.J. 2001) ("While the feasibility requirement is not rigorous . . . the plan proponent must, at minimum, demonstrate that the Debtor's income exceeds expenses by an amount sufficient to make the payments proposed by the plan."); *In re Wilkinson*, 99 B.R. 366, 369 (Bankr. N.D. Ohio 1989) ("[D]ebtors will not be able to comply with the plan and make all payments thereunder.").

## FINDINGS OF FACT AND PROCEDURAL HISTORY

*Initial Chapter 13*

This case started in chapter 13 on June 24, 2005. At that time, Lori Buccolo had separated from her husband, Bruce Buccolo, and had filed for divorce. Ms. Buccolo had moved out of the marital home that was still occupied by her estranged husband. Title to the home was solely in her maiden name, Lori A. La Pira. Although she and Mr. Buccolo both contributed to the purchase of the property, title was taken in her name alone. Mr. Buccolo apparently had some credit problems. However, there is an unrecorded written agreement between Bruce and Lori that each owns a 50% interest in the residence.

Prior to the petition in bankruptcy, the mortgagee had obtained a judgment of foreclosure on April 11, 2005, and was moving towards a sheriff's sale. A judgment creditor had, likewise, scheduled a sheriff's sale of the residence.

Ms. Buccolo's initial chapter 13 plan called for a minimal payment of $100 per month to the chapter 13 trustee and sale of the residence within 12 months. All creditors would be paid in full since the Debtor estimated the value of the residence at $850,000, secured claims at less than $400,000, and unsecured claims at less than $150,000. Ms. Buccolo promptly hired a realtor to market her property. She also filed a complaint against Bruce Buccolo alleging that he refused to cooperate in the sale of the residence, was not paying the mortgage or other expenses, and was thwarting her sale efforts. In a certification filed in the adversary proceeding, Lori Buccolo stated:

> All of my debts resulted from Bruce and his various business
> dealings. I would not be in this Chapter 13 bankruptcy but for

6

> Bruce. He failed to pay various debts he incurred in my name,
> resulting in judgments against me. In addition to creating all this
> debt in my name, he has destroyed my credit completely.
>
> This "approval letter"[1] fails to take into account Bruce's poor
> credit history, as well as the long line of judgments against him. I
> am aware of Bruce's inability to secure financing, as this was one
> of the reasons that the property was purchased solely in my name.
> This letter is no guarantee that Bruce has the ability to secure
> financing to secure an independent mortgage on the property, and
> given my knowledge of Bruce's finances, I am extremely doubtful
> that Bruce could secure adequate financing to secure a loan of
> $450,000.

She asked to have him removed or compelled to cooperate in the sale. This court granted her request for an injunction, but allowed him to remain in the residence until sold provided he paid all post-petition costs, including the mortgage, and cooperated in the sale.[2]

As the one-year anniversary of the bankruptcy case approached, Lori Buccolo had not yet procured a contract of sale. She blamed Mr. Buccolo for continuing to disrupt marketing of the property. He responded with a motion to convert the case to chapter 7 so that he could offer to buy the house from the chapter 7 trustee. Simultaneously, Countrywide filed a motion for relief from the automatic stay alleging that several monthly post-petition mortgage payments had not been made. Despite the fact that Mr. Buccolo's continued occupancy was conditioned on his paying the mortgage, Ms. Buccolo alleged that he had failed to pay the mortgage for seven months as evidenced by Countrywide's motion for relief from the automatic stay.

---

[1] Referring to a loan proposal Bruce had presented to the court.

[2] An opinion containing findings of fact was docketed in adversary proceeding number 05-02819, January 11, 2006. Those findings of fact are incorporated herein by reference.

*Conversion to Chapter 7*

Because it appeared that the animosity between Mr. & Ms. Buccolo was adversely impacting creditors as well as the Debtor, the court converted Ms. Buccolo's case to chapter 7 on June 14, 2006. Thomas Orr qualified as the Chapter 7 Trustee.

Mr. Orr continued to market the residence through his realtor without success. He, similar to Ms. Buccolo, claimed that Bruce Buccolo was interfering with his realtor's marketing efforts. Seven months after his appointment, the Trustee filed an adversary complaint to have Mr. Buccolo removed from the residence. Mr. Buccolo not only disputed the Trustee's claims but moved to compel the Trustee to sell the residence to him for $500,000, a price sufficient to satisfy all creditors. Lori Buccolo objected to Bruce's proposal because the price was substantially below market value of $850,000. She expected a surplus from the sale of the home after payment of all creditors that, she acknowledged, would be subject to equitable distribution in the matrimonial action in state court.

The court granted the Trustee's request and ordered Mr. Buccolo to vacate the residence by March 31, 2007. His cross motion to compel a sale to him was denied. He appealed to the district court (First Appeal). His request for a stay pending appeal was denied by the bankruptcy court. The district court orally granted a temporary stay pending appeal on March 19, 2007, "to preserve the status until briefing on the stay motion is complete."

At this time, Lori Buccolo became frustrated with the lack of progress in her divorce case. She had dealt with four different lawyers in two different firms, incurred tens of thousands of dollars in legal fees, but the end of her dispute with her husband was not in sight. Likewise, her plan to sell the residence in bankruptcy had not succeeded and the Trustee was stymied by

her husband. For the sake of her son, in late March 2007, she decided to move back into the house and withdrew her divorce complaint.

Back in the bankruptcy court, a default judgment making the injunction permanent was entered because Mr. Buccolo failed to answer the complaint. His motion to vacate the default judgment and allow him to file an answer out of time was denied because he did not present a meritorious defense. He appealed to the district court again (Second Appeal).

Mr. Buccolo failed to provide the district court with the transcript of the proceeding in bankruptcy court, so on July 20, 2007, the district court extinguished the temporary stay of his eviction and ordered him to show cause why his appeal should not be dismissed for lack of prosecution. The district court gave him one final chance to file a brief by September 7, 2007. When he failed again to meet that deadline, on October 23, 2007, the district court dismissed the First Appeal finding a history of dilatoriness and that his appeal had little merit. His motion for reconsideration was denied by the district court on December 19, 2007.

The district court also dismissed the Second Appeal for failure to prosecute and lack of merit. He appealed to the court of appeals which denied his emergent motion to stay eviction on April 7, 2008, finding that Mr. Buccolo "has not shown a likelihood of success on the merits of his petition." Mr. Buccolo filed a motion to proceed *in forma pauperis* in the court of appeals that was granted on June 3, 2008. He claimed to have a meager income, only $248 in cash and no other assets of value.

With no stay pending appeal, the Trustee renewed his efforts to have Mr. Buccolo removed. The Debtor then reversed her position and opposed the sale of the residence. In response, the Trustee moved to have her evicted as well, which was granted. She appealed to the

district court, *pro se*. The bankruptcy court denied her motion for a stay pending appeal and the district court dismissed her appeal for failure to file a designation of record. Her bankruptcy counsel withdrew and new counsel appeared. She then filed the instant motion to reconvert to chapter 13 on an emergent basis. Because of the disputed facts the court refused to decide the motion without an evidentiary hearing. To preserve the status quo until the motion could be decided, the court entered an order conditioning the Debtor's continued occupancy in the residence on her paying $6,000.00 per month to Countrywide. This amount was selected because it is slightly less than the amount Ms. Buccolo would have to pay if her plan were confirmed.

An evidentiary hearing was held at which the Debtor and her husband testified. They also called mortgage broker who testified that if Ms. Buccolo made all of her payments under a chapter 13 plan for twelve months on time, she would qualify for a new mortgage in an amount sufficient to pay all claims in full. The court reserved decision and continued the order requiring the debtor to pay $6,000.00 on the first of each month until a decision has been rendered.

*Mortgage Payments Post Petition*

At the initial hearing held November 15, 2005, on the Debtor's request to have her estranged husband removed from the house, he produced copies of cancelled checks showing he had paid the mortgage for the post petition months of July, August, and September 2005. His attorney represented that he had paid October and November 2005 as well. In January 2006, when the court permitted Mr. Buccolo to remain in the property, one of the conditions was that he continue to make the monthly mortgage payments.

By June 2006, the mortgagee, Countrywide, moved for relief from the automatic stay

10

alleging that the mortgage payments were in arrears. Mr. Buccolo disputed this but did not provide cancelled checks to prove payment. The issue did not need to be resolved because Countrywide withdrew its motion after the chapter 7 trustee was appointed.

On January 25, 2007, during a hearing on the trustee's request to remove Mr. Buccolo, information obtained by the Debtor's attorney from Countrywide indicated that no mortgage payments had been made since March 2006. Through counsel, Mr. Buccolo denied that he was behind and said he had made all payments. He offered to produce cancelled checks but never did.

The Trustee sought to reconcile the conflict between Mr. Buccolo's contention that he had made all post petition mortgage payments with Countrywide's position that the mortgage was in arrears since March 2006. Although Mr. Buccolo had not produced a cancelled check after September 2005, he did produce a bank statement showing a withdrawal in the amount of the mortgage payment on November 30, 2006. The Trustee subpoenaed an account statement for November 2006 from Mr. Buccolo's bank. It did not show a withdrawal for the mortgage payment. The Trustee accused Mr. Buccolo of presenting an altered bank statement to the court. Mr. Buccolo denied that he had done so and questioned the accuracy of the bank record produced by the Trustee.

At the hearing on the Debtor's motion to reconvert her case to chapter 13 held August 14, 2008, Countrywide introduced into evidence a statement showing approximately $15,000 in payments since the bankruptcy case started whereas three years of payments would have totaled over $60,000. Mr. Buccolo did not produce any canceled checks but testified that he had reviewed his records and that he had made 17 payments since 2003.

The court finds Mr. Buccolo's testimony unreliable in this regard. He knew that his continued occupancy was conditioned on his keeping the post petition mortgage payments current. He also knew that the Trustee and Countrywide maintained that he was severely delinquent, yet he failed to produce copies of cancelled checks to prove payments beyond September 2005 and admitted that he had made no more than 17 payments since 2003 although the case is more than three years old. The representation made through his counsel on January 25, 2007, that he had made all post petition payments to that time, was false.

Lori Buccolo's continued occupancy of the residence pending a decision on her motion to reconvert is conditioned on her paying $6,000.00 per month to Countrywide. She relied on Bruce to make the payments, just as she would if her plan were confirmed. The July 1st payment was made timely; not so the August 1st payment. When Countrywide's attorney did not receive the August payment, out of coutesy she advised Ms. Buccolo's lawyer, who reached out for Bruce. He eventually came up with the money, albeit late. Following the hearing in August, the September 1st payment was made on time, but the October 1st payment was not. Again Countrywide's lawyer gave notice to Ms. Buccolo's lawyer and a late payment was tendered from Bruce Buccolo's company on October 10, 2008.

*Feasibility*

With her moving papers, the Debtor included a proposed chapter 13 plan that calls for payments of $3,500 per month to the chapter 13 trustee and regular monthly payments of principal and interest on her home mortgage to Countrywide in the amount of $1,798. She also filed amended schedules I and J disclosing her income and that of her non-debtor spouse, Bruce, and the household expenses. Ms. Buccolo has a good job with a pharmaceutical company

making $69,000 per year. Her net take home pay each month is $3,565. She is willing to have a wage order entered sending all of her net income to the chapter 13 trustee to fund the monthly payments called for in her plan.

To pay her all her household expenses including her mortgage and real estate taxes, Ms. Buccolo will rely on her husband, Bruce, and her second job working for his company that nets her about $1,500 per month. He operates a limousine service through a corporation owned by Lori and the estate of his deceased father. Schedule I projects Bruce's annual gross income at $84,000 and net monthly take home pay at $5,166. The limousine business suffered a severe blow following the terrorist attack on the World Trade Center on September 11, 2001. Some of the commercial accounts relocated from lower Manhattan and stopped using the limousine service. Mr. Buccolo repositioned the company to the social market place serving weddings, proms and other social events. It is a seasonal business with highs in the wedding and prom season and the Christmas holidays and lows early in the year.

For this plan to work, Mr. Buccolo would have to bring home sufficient net income to pay $1,798 to Countrywide each month plus real estate taxes and insurance escrow in excess of $1,000 per month – a total of approximately $3,000 per month in addition to all other household expenses of approximately $1,800. According to the amended Schedules I and J they project sufficient net income to cover all expenses and the plan payments.

Lori and Bruce's household income has been the same since she moved back into the house in March 2007. She had the same good salary at her job in 2007 with a small raise in 2008. She had also worked a second job at Bruce's limo company. Bruce's 2007 income tax return shows over $82,000 in wage income. Their new schedules I and J show a net cash

available after paying all expenses of over $5,000 per month. So, as the trustee's counsel brought out in cross examination, if they had not been paying their mortgage and real estate taxes during that time, they should have had at least $8,000 in excess income each month. However, they do not have a stockpile of cash at this time and Lori Buccolo testified that she has not had $8,000 extra at the end of any month since she moved back into the martial residence. Lori Buccolo had no idea why they had been unable to accumulate cash during the eighteen months since she and Bruce had reconciled. Bruce's only excuse was that he had accrued large legal fees in connection with the divorce case and Lori's bankruptcy case. However, most of his legal fees remain unpaid as have Lori's. No credible explanation was provided as to why the Buccolos had not accumulated significant cash during the last eighteen months if their income and expenses have been the same as on their amended schedules I and J (that shows a $5,000 monthly surplus) and they have not been paying their mortgage and real estate taxes of approximately $3,000 per month. The court is left with the conclusion that their income is probably overstated and their expenses are probably understated.

It is admirable that the Debtor is willing to devote her entire net income to the plan via a wage order. However, this proposition leaves none of the Debtor's own income for her family and her life expenses. Courts have skeptically looked upon plans that fail to factor in necessary life expenses or are so delicately budgeted that they fail to contemplate unforeseen emergencies. *In re Guerrieri*, 10 B.R. 464, 465 (Bankr. D.R.I. 1981) ("[T]he Bankruptcy Code requires that a plan be feasible before the Court can confirm it. Desire cannot be substituted for the ability to pay, and based on the figures, this proposed plan is not feasible. By putting their last pennies into the plan, the Debtors have left nothing for the contingencies with which we all face."); *In re*

14

*Washington*, 6 B.R. 226, 229 (Bankr. E.D. Va. 1980) (denying plan confirmation as the thin difference between income and expenses left no room for clothing, laundry, or medical care costs, and consequently was not feasible).

Without any of her own income, the Debtor is completely reliant on her husband's income. Courts have also been skeptical of plans that rely on the income of a non-debtor to succeed. *In re Olp*, 29 B.R. 932, 936-937 (Bankr. D. Wis. 1983) (finding that the plan was not feasible where it depended on a spouse's income who was not a party to the bankruptcy and thus not bound by the plan (citing *In re Avins*, 19 B.R. 736, 737 (Bankr. S.D. Fla. 1982))). This is true even in cases where the non-debtor is a spouse that otherwise pools income with the debtor. *Id.*

Compounding this problem is the character of Mr. Buccolo's income. As the owner of an admitted "seasonal" trade that recently suffered a significant loss of business post-September 11th, there is too much uncertainty for the plan to be feasible. Where a plan relies on the income of a business that is seasonal in nature, courts often do not find the requisite reliability of the income. *In re Haskell*, 252 B.R. 236, 244 (Bankr. M.D. Fla. 2000) (finding that the seasonal nature of the debtor's boating business did not support the feasibility of chapter 13 plan); *In re Goodavage*, 41 B.R. 742, 746 (Bankr. E.D. Va. 1984) (finding that the plan was not feasible where debtors' employment was subject to seasonal changes and where plan depended on an inflexible and delicately balanced budget, leaving no cushion to absorb unforeseen expenses).

Furthermore, the court finds the Debtor's reliance on her non-debtor spouse to be not in good faith. She certified under oath that Bruce was the cause of her financial problems, that he incurred debts in her name that he failed to pay and had destroyed her credit completely. She

also certified that Bruce had a long line of judgments against him which was the reason title to the house was put in her maiden name alone. It is disingenuous for her to propose a plan that relies so heavily on the financial ability of her unreliable husband.

Mr. Buccolo has misrepresented to the court that he had been making all post petition mortgage payments through January 2007 and has produced no proof of any payment after September 2005, except for the November 2006 bank statement that the Trustee claims is false. The district court found that Mr. Buccolo had a history of being dilatory and he represented to the court of appeals that he was impecunious. Knowing that their continued occupancy was dependent on their paying $6,000 per month until the court rendered this decision, the Buccolos, nevertheless, failed to make timely payments for August and October 2008. Ms. Buccolo has failed to carry her burden of proving that the payments needed to fulfill her plan are likely to be made.

*Future Mortgage Refinancing*

An experienced mortgage broker testified for the Debtor that if she scrupulously made all post confirmation mortgage payments and trustee payments for twelve months, and if the value of the residence remained the same, she would qualify for a mortgage loan in an amount sufficient to satisfy all the claims in her chapter 13 case. This testimony was given at a time when the sub-prime mortgage crises had been in the news for months. The credit market and real estate market have only gotten worse. To say the prospect of the Debtor qualifying for refinancing in twelve months is uncertain would be an understatement. However, even if the court were to accept the opinion of the mortgage broker that the Debtor would qualify for a mortgage if she were to scrupulously pay all post confirmation mortgage payments to

Countrywide and all Trustee payments, she has demonstrated that she is not likely to do that since she could not manage to make the August and October 2008 payments mandated by the court as a condition of her continued occupancy.

## CONCLUSION

Feasibility of the Debtor's plan depends on two shaky grounds: her husband Bruce's ability to contribute $4,800 per month and her ability to borrow $600,000 in twelve months. Bruce has demonstrated his unreliability by his failure to make all post petition mortgage payments and his untruthful representation that he had through January 2007. No one can predict the availability of credit in twelve months in light of the turmoil in the financial market; however, the Debtor is unlikely to qualify for financing, all other things being equal, because she has demonstrated an inability to make timely payments under the court's mandate. A plan that relies so heavily on the man accused of being the cause of her financial downfall has not been proposed in good faith. Because this court finds the debtor's motion to reconvert to be lacking in good faith and her plan not feasible, the motion is DENIED.

Dated: November 25, 2008         **/S/Raymond T. Lyons**

                                United States Bankruptcy Judge